**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CRIMINAL CASE NO. 17-15-DLB-CJS**

**UNITED STATES OF AMERICA**                                        **PLAINTIFF**

**v.**                            <u>**REPORT AND RECOMMENDATION**</u>

**FRANK LAMAR GAITHER**                                        **DEFENDANT**

**\* \* \* \* \* \* \* \* \* \***

On May 23, 2017, Defendant Frank Lamar Gaither ("Gaither" or "Defendant") was arrested following an investigation by the Drug Enforcement Administration ("DEA") Task Force. (*See* R. 3, at 3; R. 21, at 1). Defendant Gaither was charged in a federal criminal complaint with possession with the intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1). (R. 3, at 1). A federal Indictment followed on June 8, 2017, which was superseded on October 12, 2017. (*See* R. 9; R. 35). Under the Superseding Indictment, Defendant now stands charged with one count of conspiracy to distribute controlled substances; two counts of possession of actual methamphetamine with the intent to distribute 50 or more grams; and one count of possession of controlled substances with intent to distribute, all in violation of 21 U.S.C. § 841(a)(1). (R. 9-1; R. 35-1).

This matter is now before the Court on Gaither's July 26, 2017 Motion to Suppress, wherein Gaither seeks to suppress all evidence obtained from his May 23, 2017 arrest and subsequent search of his person and vehicle. (R. 21). Gaither also moves to suppress the search of 2 mobile phones recovered from his friend Shahana Hollon's home following his May 23, 2017 arrest, as well as 2 additional phones recovered in the course of the DEA investigation. (*Id.*).

Defendant Gaither contends that suppression is warranted because law enforcement violated his Fourth Amendment right to be free from unreasonable searches and seizures. (*Id.*). The Government filed its Response on August 16, 2017 (R. 26), and Defendant filed a Reply requesting an evidentiary hearing on August 22, 2017 (R. 27).

The Court held an evidentiary hearing on the Motion. (R. 32). Gaither appeared by counsel, Steven Howe, and the United States was represented by Assistant United States Attorney Anthony Bracke. (*Id.*). At the hearing, the United States called DEA Supervisory Special Agent Brian Stine, Task Force Agent D. Shannon Taylor, and Covington Police Officer Ryan Malone to testify regarding the investigation, arrest, and subsequent searches and seizures. (R. 32, at 2). These witnesses were cross-examined by defense counsel. (*Id.*). Defense counsel represented Defendant's intention to call to testify Shahana Hollon, who the Government identified as a material witness in this case; however, appointed counsel for Ms. Hollon represented that she would invoke her Fifth Amendment privilege against self-incrimination if called to testify, and she was excused from the proceedings. (R. 32, at 1-2; R. 39, at 3-9). At the conclusion of the hearing, the Court granted Defendant's request to file post-hearing briefs. A transcript of the hearing and the parties' post-hearing briefs having been filed (R. 39; R. 42; R. 43), the matter is now ripe for consideration. The Motion has been referred to the undersigned for preparation of a Report and Recommendation[1] pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* R. 14). For the reasons set forth below, it will be recommended that Defendant's Motion to Suppress (R. 21) be **denied**.

---

[1] *See United States v. Quinney*, 238 F. App'x 150 (6th Cir. 2007) (citing *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001) (characterizing a motion to suppress as dispositive)).

## I.    Factual Background and Procedural History[2]

Beginning in February 2017, a "Cooperating Sources" individual (hereafter "Informant") agreed to cooperate with the DEA and local law enforcement in the investigation of methamphetamine distribution and trafficking in the Northern Kentucky area by providing information on the source of his or her supply of methamphetamine. (R. 3, at 1). The investigation turned to Defendant Gaither based upon the Informant's cooperation with law enforcement. The Informant disclosed to Agent D. Shannon Taylor—a detective with the Boone County, Kentucky Sheriff's Department assigned to the DEA as a federal task force officer—that he or she had purchased methamphetamine and heroin from an individual known as "Frank" on numerous occasions over the preceding 6 months. (*Id.*). The Informant described "Frank's" physical description, including his gender, race, approximate age, weight, and appearance. (R. 3, at 1). The Informant also described the color and model of 2 vehicles "Frank" drove—a dark blue Honda and a maroon Acura SUV. (R. 3, at 1). Through an independent investigation, the Agent identified "Frank" as Defendant Frank Lamar Gaither. (*Id.*). The investigation further confirmed from motor vehicle records that a maroon Acura MDX SUV (the "Acura SUV") was registered to Defendant's mother. (R. 3, at 3; R. 39, at 48).

On May 23, 2017, Agent Taylor met with the Informant to set up a controlled buy of methamphetamine from Defendant Gaither. (R. 3, at 2). The Informant made contact with Gaither by phone and sought to arrange the purchase of half a pound of crystal methamphetamine for $4,500. (R. 3, at 2; R. 39, at 50). Defendant discussed by phone with the Informant the type, cost, and quantity of controlled substances available, as well as the location and time for the transaction.

---

[2] In addressing Defendant's subject Motion, the Court considered the parties' submissions and evidence from the September 29, 2017 evidentiary hearing before the undersigned. (R. 32). The Court also considered the affidavit of Agent Taylor, submitted in support of the Government's May 24, 2017 Criminal Complaint. (*See* R. 3).

(R. 39, at 50-53). Gaither confirmed that he had half a pound of crystal methamphetamine but would also sell a "full one," a full pound, for $10,000, and that his "people" had 7 more pounds on hand. (R. 3, at 2). Gaither also agreed to provide heroin. (R. 39, at 50-51). Defendant and the Informant agreed to meet at approximately 7:00 p.m. that day at a gas station in Covington, Kentucky. (R. 39, at 15-16). This series of phone calls was monitored by the law enforcement team, and Agent Taylor was able to hear both sides of the call and transmit this information to the other law enforcement team members. (R. 39, at 49-50; *see id.* at 15).

After setting up the controlled buy, the law enforcement team planned an operation to locate Gaither at the agreed-upon meeting location and place him under arrest. (R. 39, at 55). DEA Enforcement Supervisor Brian Stine oversaw and assisted Agent Taylor in planning and executing the operation. (R. 39, at 12-13). During the operational briefing of the law enforcement team, copies of the operational plan were provided. (R. 39, at 13-14; *id.* at 34). The operational plan contained a photograph of Defendant Gaither. (R. 39, at 13-14, 34, 47-48). The photograph was obtained from law enforcement from a prior April 2017 arrest, and the Informant had positively identified the photograph as the individual he knew as "Frank." (R. 3, at 1; R. 39, at 47-48). The operational plan also contained a description of the Acura SUV and identified its license plate number. (R. 39, at 49; *see id.* at 91-92).

Prior to the prearranged meeting time of 7:00 p.m. on May 23, 2017, Agent Taylor sent a DEA agent to a location on Windsor Street in Cincinnati, Ohio; upon arrival, the agent observed an Acura SUV matching the license plate and description of the vehicle registered to Defendant's mother as set forth in the operations plan. (R. 3, at 2; R. 39, at 48-49). The DEA agent observed the vehicle leave the Cincinnati, Ohio, address and proceed to Covington, Kentucky. (R. 39, at 14-16; *id.* at 48-49). Shortly thereafter, the surveillance team observed the Acura SUV leave the

agreed-upon gas station location in Covington, Kentucky, where Defendant and the Informant had planned to meet, and travel down Madison Avenue; a uniform car followed close behind him. (R. 39, at 16). Officer Ryan Malone, one of the law enforcement team members, was able to see inside the windshield of the car and identify Defendant from the photograph provided in the operational briefing. (R. 39, at 96-97).

While the Acura SUV was travelling along Madison Avenue, trailed by surveillance, Supervisor Stine's unmarked vehicle, and Officer Malone's marked cruiser, Defendant Gaither called the Informant and changed the location of the transaction to Bob's Food Mart on the corner of Madison and Alexandria Avenues in Covington, Kentucky. (R. 39, at 16, 54, 92-94). Officer Malone, Supervisor Stine, and the surveillance team observed the Acura SUV turn left onto Alexandria Avenue and pull into the parking lot of Bob's Food Mart. (R. 39, at 15-18; *id.* at 54-55; *see also* R. 3, at 2). The other operations team members were aware from radio transmissions that the location had been moved, and several officers stationed at the first location, including Officer Taylor, then began travelling to Bob's Food Mart. (R. 39, at 18). While law enforcement did not have eyes on Defendant every moment from beginning to end, the team substantially maintained visual surveillance of Defendant and observed him travel from the first location to the parking lot of Bob's Food Mart. (R. 39, at 18).

When the Acura SUV turned left into the parking lot of Bob's Food Mart, the surveillance cars, Officer Malone, and Supervisor Stine continued down Madison Avenue so as not to raise suspicion. (R. 39, at 16; *id.* at 94). Supervisor Stine continued moving with traffic along Madison Avenue in his unmarked car, then turned around at an ice cream stand approximately 100 yards away from Bob's Food Mart along Madison Avenue. (R. 39, at 16). Maintaining visual contact after turning around, Supervisor Stine observed Defendant exit Bob's Food Mart and then get back

into his vehicle, drive down a side street and turn around in a driveway; Defendant then parked the Acura SUV along the street. (R. 39, at 167-17). Supervisor Stine had parked his unmarked car approximately 7 or 8 car lengths away. (R. 39, at 17). Supervisor Stine then observed Defendant walk back towards Bob's Food Mart. (R. 39, at 17). As Gaither passed Supervisor Stine's vehicle, the officer observed Gaither lean down and attempt to peer into the unmarked car's heavily tinted windows. (R. 39, at 17-18). Defendant then walked down Alexandria Avenue, passing Bob's Food Mart and making a left turn onto Madison Avenue towards the ice cream stand. (R. 3, at 2; R. 39, at 18).

While Defendant was walking down Madison Avenue, Agent Taylor arrived from the first agreed-upon location with the Informant and drove past Defendant. (R. 39, at 56). As Agent Taylor's vehicle drove by, the Informant positively identified Defendant Gaither in person as the individual known as "Frank" who had arranged to meet and conduct the transaction. (R. 26-2, at 9; R. 39, at 56; *id.* at 83).

Upon positive identification by the Informant, Agent Taylor planned to drive the Informant to a secure location and then return to the scene. (R. 39, at 56). Agent Taylor communicated the call to have one of the team members in a marked car make the stop to arrest Defendant. (*Id.*). However, the team had "technical difficulties" getting a marked car to make the arrest while maintaining minimal exposure to the people present in the parking lot of the ice cream stand, which was located approximately 100 yards down Madison Avenue from Bob's Food Mart. (R. 39, at 18-21; *id.* at 95). Officer Malone, the team member with the marked, uniform vehicle, had continued driving his vehicle down Madison Avenue so as not to raise suspicion. (R. 39, at 94). Since Stine's unmarked vehicle was one of the few equipped with lights and a siren, he then proceeded to stop Defendant near the ice cream stand approximately two blocks away as Defendant

6

walked along Madison Avenue.  (R. 39, at 18-21).  Stine and other law enforcement team members recognized Defendant Gaither from the photograph that had been provided to the law enforcement team, and could also see that the subject arrested was the subject seen driving the Acura SUV.  (R. 39, at 18; *id.* at 96).  Defendant was placed under arrest and given Miranda warnings.  (R. 39, at 38; *id.* at 74).  His pockets were emptied, and inside a key fob to an Acura was found.  (R. 39, at 37).  No controlled substances or other illegal objects were found on Defendant's person.  (R. 39, at 37).

Following the arrest, Defendant Gaither was placed in a law enforcement vehicle and moved back to the location where the Acura SUV was parked near Bob's Food Mart.  (R. 3, at 2; R. 39, at 22).  Defendant denied driving the vehicle and asserted that he was just walking to the store.  (R. 3, at 3; R. 39, at 38).  When Agent Taylor returned to the scene, he was instructed to go straight to where Defendant Gaither had parked the Acura SUV on the side street, approximately 60 yards from Bob's Food Mart.  (R. 39, at 56).  Agent Taylor had his certified narcotic canine police dog ("K-9") with him.  (R. 39, at 39; *id.* at 56).  The team confirmed that the key fob taken from Defendant's pocket matched the Acura SUV by activating the car lock with the fob.  (R. 39, at 22).  Agent Taylor then conducted an open-air sniff of the exterior of the vehicle utilizing the K-9.  (R. 3, at 3).  Agent Taylor gave the K-9 a search command and walked her freely around the vehicle, moving counterclockwise from the rear left quarter panel near the trunk.  (R. 39, at 58-59).  Scanning the vehicle, the dog then "indicated" the presence of controlled substances near the seams of the rear passenger door on the driver's side, as well as the driver's side door.[3]  (R. 3, at 3; R. 39, at 40, 59).

---

[3] At the September 29, 2017 evidentiary hearing, Agent Taylor testified as to the dog's training and history and stated that the K-9 was trained to detect four drug groups: marijuana, cocaine, heroin, and methamphetamine.  (R. 39, at 56-60).

The law enforcement team then unlocked the Acura SUV using the key fob taken from the search of Defendant's person and, while Defendant was secured, conducted a search of the vehicle. (R. 3, at 3; R. 39, at 35, 60). The search revealed a plastic bag in the center console that contained 8 individual baggies of a crystalline substance Agent Taylor identified as crystal methamphetamine; also located in the dash compartment under the radio was a plastic bag containing 4 individual baggies of a brown chunky substance Agent Taylor identified as heroin. (R. 3, at 3; R. 39, at 60-62). Three cell phones and a charger were also seized from the interior of the vehicle. (R. 26-2, at 10). Defendant denied knowledge of the substances and maintained that the vehicle was not his and he was just a passenger that was dropped off. (R. 3, at 3).

At approximately 9:00 p.m. that evening, Agent Taylor, Supervisor Stine, and two other officers traveled to the apartment of Shahana Hollon. (R. 39, at 24-25, 60). Investigation had revealed that Ms. Hollon and Defendant had a child in common, and Defendant stayed at Ms. Hollon's apartment on occasion. (R. 39, at 41, 77; *see also* R. 26, at 3). Two law enforcement team members stood in the driveway out of view while Agent Taylor and Supervisor Stine went to the front door. (R. 39, at 76). The officers explained to Ms. Hollon that Defendant was in custody and had been discovered with a large amount of narcotics; they expressed that they did not believe Ms. Hollon was involved, but they wanted to confirm whether Defendant was keeping anything tied to the investigation at the residence. (R. 39, at 62). The officers asked Ms. Hollon if there was anything in the residence that she was aware of, and she responded that there were some clothes of his as well as a box belonging to Defendant in his closet upstairs. (R. 39, at 24-25, 63). She stated that she did not know what the box contained, but it belonged to Mr. Gaither. (R. 39, at 25, 63). Supervisor Stine asked if Ms. Hollon would be willing to take the officers inside and show them the box, and she said she would. (R. 39, at 25; *see also* R. 21, at 3).

8

Ms. Hollon led Stine and Taylor into the house to an upstairs bedroom with a double closet and directed them to a white box on the top shelf of the right side closet.  (R. 39, at 25).  The box contained various paraphernalia, including 2 mobile phones.[4] (R. 39, at 25, 63).  After Ms. Hollon showed the officers the box, Agent Taylor then asked Ms. Hollon if she would allow him to bring his K-9 into the apartment to conduct a search for controlled substances.  (R. 39, at 78).  Ms. Hollon agreed, and then signed a standard DEA Consent to Search form.  (R. 39, at 26, 78-79).  The form contains pre-printed statements in all capital letters asserting that "I HAVE NOT BEEN THREATENED, NOR FORCED IN ANY WAY" and "I FREELY CONSENT TO THIS SEARCH." (R. 26-1).  Agent Taylor filled out the form, and it was signed by Ms. Hollon and witnessed by Supervisor Stine.  (R. 26-1; R. 39, at 26, 63).  The K-9 performed a scan of the apartment, and no drugs or other illegal substances were found.  (R. 39, at 42, 78-79).  Following the search, the white box taken from the closet was seized; nothing else, however, was taken from the residence.  (R. 39, at 25).

Agent Taylor and Supervisor Stine deny that Ms. Hollon asked whether the officers had a search warrant when they asked for her consent to search the home; they also deny that the officers told Ms. Hollon that if forced to obtain a warrant, the Cabinet for Family Services may have to get involved.  (R. 39, at 40-41).  Agent Taylor testified that at some point during the visit to Ms. Hollon's home, he did mention possible involvement of the Cabinet of Families and Children should narcotics be found in Ms. Hollon's possession:

> Q:   When – when you-all knocked on the door, do you recall her ever asking whether or not you had a warrant?
>
> A:   I do not recall that, no, sir.

---

[4] The box also allegedly contained digital scales, a stainless press, a hydraulic jack, plastic baggies, an electric mixer, Miralax, a spoon, a hammer, a strainer, and 3 credit cards.  (*See* R. 21, at 3-4).

Q:    Okay. Were there any comments made concerning if you had to get a warrant, that the Cabinet for Family Services would be involved because of the children?

A:    No, sir.

Q:    Was there any – at any point, not only at the threshold there, at any point, was there any comment made by law enforcement to her about getting Cabinet for Family Services involved because of the children in the place?

A:    The only thing that was mentioned about the Cabinet of Families and Children was if she was found to be in possession of narcotics there at the house, the Cabinet would be involved at that point to take possession of the children, because she was the only adult there at the house.

Q:    Okay. Do you know, during the sequence, Agent Taylor, when that would – that conversation would have taken place? Was that before the items were found in the closet or after? Do you recall one way or the other?

A:    I don't recall exactly when it was, no, sir.

(R. 39, at 77-78; *see also id.* at 40-41, 64).

On June 12, 2017, Agent Taylor applied for 4 search warrants to extract electronically stored information from the mobile phones recovered from the investigation and stored at the DEA Cincinnati Resident Office in Cincinnati, Ohio. (*See* R. 26-2; R. 26-3; R. 26-4; R. 26-5).[5] Magistrate Judge Karen Litkovitz of the Southern District of Ohio issued the 4 warrants on June 12, 2017. (*Id.*). The warrants commanded the United States to execute on or before June 26, 2017. (*Id.*). Agent Taylor testified he does not know when the search of the phones began, as only two agents in the DEA office have the capability of electronically extracting data from a phone using

---

[5] The investigation resulted in seizure of 5 mobile phones: three from the search of the Acura SUV, and two from the box stored in Ms. Hollon's closet. With respect to the fifth mobile phone device, a pink iPhone, Agent Taylor attested that law enforcement was unable to access it and therefore did not seek a warrant. (*See, e.g.,* R. 26-5, at 7-10; R. 39, at 84).

a program called Cellbrite.  (R. 39, at 84).  The Cellbrite program successfully extracted data from one phone, and that warrant was returned on June 14, 2017; however, law enforcement was not able to access the data from 3 of the 4 mobile phone devices as the Cellbrite program was incompatible.[6]  (R. 39, at 85; *see also* R. 26-2, at 19; R. 26-3, at 19; R. 26-4, at 19; R. 26-5, at 19).

For those phones incompatible with Cellbrite, Agent Taylor manually searched them and took photographs of the displayed contents, including text messages and other phone data.  (R. 39, at 85-86).  Agent Taylor finished his manual search of these 3 remaining phones on June 27, 2017—one day after the June 26, 2017 execution deadline set forth on the warrants.  (R. 26-2, at 1; R. 26-3, at 1; R. 26-4, at 1; R. 26-5, at 1).  Agent Taylor testified that he cannot definitively state what day the phones were returned to him following the unsuccessful Cellbrite extraction, but his search began within the time period set forth on the face of the warrant.  (*See* R. 39, at 84-88).

## II.    Analysis

Generally, "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."  *United States*

---

[6] The following chart summarizes the return of each of the 4 warrants:

| Warrant No. | Description | Record Citation | Electronic Data Extraction Successful | Date Warrant Returned |
|---|---|---|---|---|
| 11-mj-411 | Alcatel Mobile Phone Model #: 2017B SN: 2017-13-ZBRXCH1-R1 | (R. 26-3) | No | 06/27/2017 |
| 11-mj-412 | Alcatel Mobile Phone Model #2017B SN: 270113185014183934 | (R. 26-2) | No | 06/27/2017 |
| 17-mj-413 | ZTE Mobile Phone Model #: Z320 SN: 329F745921E9 | (R. 26-5) | No | 06/27/2017 |
| 17-mj-414 | LG Mobile Phone Model #15676 SN: 610CYPY0356520 | (R. 26-4) | Yes | 06/14/2017 |

*v. Richards*, 659 F.3d 527, 535 (6th Cir. 2011). Defendant Gaither now seeks suppression of evidence on four grounds. (*See generally* R. 21; R. 42). First, Defendant seeks suppression of the evidence recovered from his May 23, 2017 arrest on the basis that the arrest was not supported by probable cause. Second, Defendant seeks to suppress evidence obtained from the search of his person and the Acura SUV following his arrest, echoing his first contention that the officers lacked probable cause. Third, Defendant seeks to suppress evidence obtained from the officers' search of the mobile phones recovered from the investigation, arguing that the warrant had "expired" at the time the data was extracted. Finally, Defendant seeks to suppress evidence obtained from the officers' search of Ms. Hollon's apartment, arguing that Ms. Hollon's consent was involuntary and coerced. For the reasons set forth below, Defendant's Motion to Suppress should be denied.

### A.    Suppression of the evidence obtained following Defendant Gaither's arrest is not warranted because the Government had probable cause to arrest him.

Defendant Gaither first seeks suppression of evidence obtained upon his arrest on May 23, 2017, arguing the officers lacked probable cause to arrest him. The evidence introduced at the evidentiary hearing, however, demonstrates otherwise. As discussed below, the arrest was lawful because at the time the law enforcement operations team arrested Gaither, they had knowledge of sufficient facts and circumstances, based on reasonably trustworthy information, for them to believe that Gaither was engaged in the sale of methamphetamine.

It is well-established that an officer may make a warrantless arrest if he has probable cause to believe that the person to be arrested has committed an offense. *United States v. Romero*, 452 F.3d 610, 615 (6th Cir. 2006); *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996) ("Police may arrest a person without a warrant if they have probable cause at the time of the arrest to believe that the person has committed or is committing a crime"). Probable cause "is a flexible, common-sense standard" merely requiring a reasonable ground for belief of guilt at the time of the

arrest. *Texas v. Brown*, 460 U.S. 730, 742 (1982); *Romero*, 452 F.3d at 615-16 (internal citations omitted). A court's review of probable cause must "take into account the factual and practical considerations of everyday life that would lead a reasonable person to determine that there is a reasonable probability that illegality has occurred or is about to occur" under the totality of the circumstances. *Romero*, 452 F.3d at 615-16 (internal citations omitted). Thus, the question is "whether, at the time of the arrest, the facts and circumstances within the arresting officer's knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent person to conclude that an individual either had committed or was committing an offense." *United States v. Torres-Ramos*, 536 F.3d 542, 555 (6th Cir. 2008) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). While probable cause means that officers "must show more than mere suspicion, the probable cause requirement does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt." *Romero*, 452 F.3d at 615-16 (internal citations omitted).

A key issue in determining whether information provided by an informant is sufficient to establish probable cause is whether that information is reliable. *See United States v. Robertson*, 39 F.3d 891, 893 (8th Cir. 1994). An informant may establish the reliability of his information by establishing a track record of providing accurate information. *Illinois v. Gates*, 462 U.S. 213, 233 (1983). However, where a previously unknown informant provides information, the informant's lack of a track record requires "some independent verification" to establish the reliability of the information. *Robertson*, 39 F.3d at 893. Independent verification occurs when the information is—or aspects of it are—corroborated by the independent observations of police officers. *Gates*, 462 U.S. at 241-45. Accordingly, information provided by an informant, when sufficiently detailed and corroborated by the independent investigation of law enforcement officers, may form

the basis for probable cause. *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) (citing *Chambers v. Maroney*, 399 U.S. 42, 44 (1970)).

In this case, the information provided by the Informant was continually corroborated during the course of the operation by the officers' own observations, thus providing probable cause to arrest Defendant. After arranging the transaction, the Informant provided accurate and detailed information about the arranged controlled buy, predicting both the time of delivery (approximately 7:00 p.m. that evening) and the place of delivery (the Covington, Kentucky gas station). The Informant described the person who was to deliver the methamphetamine in detail and described the vehicle that he would be driving.

These elements were independently confirmed by the observations of the law enforcement operations team when the officers monitored the telephone communications between the Informant and Defendant, wherein law enforcement officers heard Defendant negotiate the sale of a half-pound of methamphetamine for $4,500. The Informant's identification of Defendant was further independently corroborated by the surveillance team's visual surveillance of the vehicle matching the Informant's description travelling to the location the Informant set up with Defendant by phone. A maroon Acura MDX SUV known to be registered to Defendant Gaither's mother and identified by its license plate travelled from an address tied to Defendant Gaither and traveled to the first prearranged location. The most convincing independent corroboration occurred when the law enforcement team then monitored a phone call between Defendant Gaither and the Informant changing the location to Bob's Food Mart; contemporaneous with the phone call, the team visually observed the Acura SUV then travel to this second location.

Moreover, not only did the vehicle match the description the Informant provided to the officers as well as the license plates previously identified by the officers, but numerous law

14

enforcement team members recognized Defendant Gaither from the photograph provided in the operations plan and identified by the Informant as a photograph of the individual who planned the controlled buy.  The Informant then positively identified Defendant Gaither as the individual who arranged the sale of methamphetamine as Agent Taylor drove by Defendant on Madison Avenue. These facts corroborated the Informant's statements to the officers about Defendant Gaither's sale of controlled substances and enhanced his or her credibility and the reliability of the Informant's tip.  In sum, multiple aspects of the Informant's detailed prediction were corroborated by the independent observations of police officers, and sufficiently warranted a reasonable officer's belief under the totality of the circumstances that Defendant Gaither had committed and was about to commit an offense.  Accordingly, probable cause existed to arrest Defendant for possession with intent to distribute methamphetamine.

In Defendant's post-hearing brief, he contends that the arrest was not supported by probable cause because "[a]t the time and place of the arrest, Defendant had not been observed engaging in a drug transaction with anyone, he had not committed any driving offenses, the location in which he was arrested, the Dairy Mart parking lot, was not a high crime location, the Defendant did not have drugs on his person and he was not in a vehicle that was subsequently searched." (R. 42, at 2).  The Sixth Circuit rejected a similar argument in *United States v. Stewart*, 315 F. App'x 554, 558 (6th Cir. 2009).  In *Stewart*, a police officer observed the defendant dart into an alley and then walk away; the officer found a plastic baggie of crack cocaine upon searching the alley and arrested the defendant.  *Id.* at 556.  In his motion to suppress, the defendant argued that there was not probable cause to arrest him because the presence of the drugs was a mere coincidence, and at the time of his arrest he was not engaged in conduct typical of a drug dealer but rather was walking down the street, mid-day, unarmed, and gave a reasonable explanation for

his behavior. *Id.* at 558. The Sixth Circuit rejected this argument and held that a reasonable officer could have concluded that there was probable cause under the totality of the circumstances. *Id.*

Here, as in *Stewart*, Defendant's argument points to Defendant's seemingly benign behavior as he walked along Madison Avenue, while failing to acknowledge the course of the officer's investigation leading up to the arrest. Here, prior to Defendant's arrest, the Informant had made contact with Gaither by phone. The law enforcement team monitored the phone call as Defendant discussed the type, cost, and quantity of controlled substances available, as well as the location and time for the transaction, by phone with the Informant. Gaither confirmed that he had half a pound of crystal methamphetamine but would also sell a "full one," a full pound, for $10,000, and that his "people" had 7 more pounds on hand. Gaither also agreed to provide heroin. Defendant Gaither then traveled to the prearranged location at the agreed-upon time, and law enforcement monitored the following call as Defendant changed the location to Bob's Food Mart. Law enforcement team members visually observed the Acura SUV travel to Bob's Food Mart, and visually observed Defendant operate and exit the vehicle. Just as in *Stewart*, Defendant's arrest was lawful because the law enforcement team had more than sufficient probable cause to believe Defendant was engaging in illegal activity under the totality of the circumstances.

Defendant next contends that his identity was in question at the time of the arrest and therefore probable cause could not have existed. This contention is not supported by the record. The testimony offered at the evidentiary hearing did not indicate substantial inconsistencies but rather demonstrated a concerted effort by multiple law enforcement operations team members, including surveillance team members, Supervisor Stine, Agent Taylor, and Officer Malone. The team members played different parts in the operation, but maintained communication and worked in conjunction with one another. The operations plan provided to the law enforcement operations

team provided a photograph of the Defendant; Officer Malone, Agent Taylor, and Supervisor Stine all testified they recognized Defendant Gaither from this photograph.

Moreover, the surveillance team maintained visual contact with Defendant as he traveled from the first agreed-upon location to Bob's Food Mart, where Officer Stine visually observed Defendant exit the vehicle and walk down Madison Avenue. While Defendant was walking, Agent Taylor arrived from the first agreed-upon location with the Informant and drove past Defendant. As Agent Taylor's vehicle drove by, the Informant positively identified Defendant Gaither in person as the individual who had arranged to meet and conduct the transaction. Agent Taylor then transported the Informant to a safe location before returning to the scene, while Officer Stine initiated the arrest. While the officers attempted to initiate the arrest with a uniform or marked police car farther away from nearby patrons at the ice cream stand, allowing Defendant to begin walking away from the vehicle, the record shows that the law enforcement team members substantially maintained visual contact with Defendant, and his identity was not in question at the time of his arrest. Accordingly, because the record demonstrates that Defendant has not satisfied his burden to show that his arrest violated the Fourth Amendment, the first ground in support of his Motion to Suppress should be denied.

### B. Suppression of evidence obtained from Defendant Gaither's SUV is not warranted because the Government had probable cause to search the vehicle using the key fob lawfully seized from Defendant's person following his arrest.

Defendant Gaither next seeks suppression of evidence obtained from the search of the Acura SUV following his arrest on May 23, 2017, arguing that the police lacked reasonable suspicion to search his person, seize his key fob, and use it to unlock and search the Acura. As discussed below, however, the Government conducted a search of Defendant's person pursuant to a lawful custodial arrest, and had probable cause to search the Acura SUV.

17

### 1. The warrantless search of Defendant's person constituted a search incident to a lawful arrest, an exception to the warrant requirement.

It is well-established that police may perform a warrantless search and seizure of an individual incident to a lawful arrest. *See Stewart*, 315 F. App'x at 559 (citing *United States v. Robinson*, 414 U.S. 218, 235 (1973) (holding that after "a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment"); *see also United States v. Campbell*, 486 F.3d 949, 955 (6th Cir. 2007) ("Once a lawful arrest has been made, the police officer is permitted to search the individual"), *cert. denied*, 552 U.S. 1083 (2007); *cf. United States v. Robinson*, 390 F.3d 853, 871 (6th Cir. 2004) (stating that the Sixth Circuit has allowed searches of automobiles incident to arrest even if the arrestee "was out of the car, handcuffed, and placed in the back seat of a police cruiser"). Moreover, police may seize both contraband and any instrumentalities, fruits, or evidence of a crime that they discover in the course of the search. *See Stewart*, 315 F. App'x at 559 (citing *United States v. Edwards*, 415 U.S. 800, 802-05 (1974)); *see also United States v. Charles*, 138 F.3d 257, 264 (6th Cir. 1998) (upholding seizure of a pager found in an automobile in a search incident to the arrest of its occupant). The doctrine is rooted both in the need to disarm a suspect for the protection of officers but also to preserve evidence for use at trial. *Arizona v. Gant*, 556 U.S. 332, 339 (2009). It is the Government's burden to establish its entitlement to the search incident to arrest exception; if the Government fails to make such a showing, the evidence must be suppressed. *United States v. Hamilton*, 16-20062, 2017 WL 1376586, at \*2 (E.D. Mich. Apr. 11, 2017).

As set forth in *Section A*, *supra*, the facts in *Stewart* are strikingly similar to the facts at hand in his case. *See Stewart*, 315 F. App'x 554. In *Stewart*, a police officer noticed the defendant dart into an intersecting alley and then rejoin his companions in walking down the street. *Id.* at

556.  After a search of the alley, the officer retrieved a plastic bag appearing to contain crack cocaine.  The officer arrested the defendant for possession and handcuffed him, then searched the defendant's pockets and found a set of car keys with a General Motors logo.  *Id.*  The defendant stated that the keys were not his and that he did not know to whom they belonged.  *Id.*  Back-up officers then used the key to unlock the trunk of a nearby vehicle; the officers did not look inside the trunk but merely used the key to match it to the vehicle.  *Id.*  The officer put the defendant in the patrol car and drove to the vehicle.  *Id.*  Several other officers arrived at the scene with a drug sniffing dog, and the dog alerted on the passenger door.  *Id.*  The back-up officers then searched the vehicle and found drugs and weapons inside.  *Id.* at 556-57.  The officer returned to the patrol car and read the defendant his *Miranda* rights.  *Id.* at 557.

Affirming the district court's denial of the *Stewart* defendant's motion to suppress, the Sixth Circuit agreed with the district court's findings of probable cause under the totality of the circumstances to seize the keys from the defendant's pocket.  *Id.* at 557-59.  The officers' search of the defendant's person and seizure of the keys in his pocket were lawful because they occurred subsequent to the defendant's lawful arrest.  *Id.* at 559 (citing *Edwards*, 415 U.S. at 802-05).  Furthermore, the Sixth Circuit found that there was probable cause to believe that the vehicle associated with the keys found in defendant's pocket might contain fruits, evidence or instrumentalities of his drug-related offense.  *Id.* at 560.  As a result, "the officers were justified in seizing the keys to look for the vehicle."  *Id.*

Here, as in *Stewart*, there was probable cause under the totality of the circumstances to seize the keys from Defendant Gaither's pocket.  Defendant Gaither was lawfully arrested, and therefore Agent Taylor was permitted to search his person.  *See Section A*, *supra*.  The keys in Defendant Gaither's pockets were discovered pursuant to a lawful search and seized with probable

cause to believe that the vehicle associated with the keys found in his pocket—keys with the Acura logo which matched the vehicle monitored by the law enforcement team members—might contain fruits, evidence or instrumentalities of Defendant Gaither's drug-related offense.  As a result, the officers were justified in seizing the keys to look for the vehicle.  The Government has satisfied its burden to demonstrate its entitlement to the search incident to arrest exception, and suppression is therefore not warranted.

**2.    The automobile exception to the warrant requirement applies to the search of the Acura SUV following Defendant's arrest**.

Defendant further argues that the use of the Acura keys and the "subsequent search of his vehicle" were unlawful.  (R. 42, at 4).  The record demonstrates, however, that the warrantless search of the Acura SUV after seizing the keys from Defendant Gaither's pockets was lawful under the automobile exception to the warrant requirement because the search was supported by probable cause.  Pursuant to the automobile exception, "an officer may perform a warrantless search of a detained vehicle should the officer have probable cause to believe the vehicle contains contraband or evidence of criminal activity."  *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012); *Lumpkin*, 159 F.3d at 986.  *See also United States v. Padro*, 52 F.3d 120, 123-24 (6th Cir. 1995) (upholding warrantless search of vehicle where officer had probable cause to believe car contained cocaine based upon an informant's tip and officer's corroboration); *United States v. Brown*, 49 F.3d 1346, 1350 (8th Cir. 1995) (upholding warrantless search of vehicle when truck matched description given by informant and it arrived at location specified for drug transaction).  It is the Defendant's burden to demonstrate "a violation of some constitutional or statutory right justifying suppression."  *United States v. James*, 575 F. App'x 636, 639 (6th Cir. 2014) (stating that burden of proof is on the defendant in reviewing district court's determination that automobile exception to warrant requirement applies).

20

The Sixth Circuit has held that "[t]he mere insertion of a key into a lock, by an officer who lawfully possesses the key and is in a location where he has the right to be, to determine whether the key operates the lock, is not a search." *Stewart*, 315 F. App'x at 558 (citing *United States v. Salgado*, 250 F.3d 438, 456 (6th Cir. 2001)). Accordingly, the Sixth Circuit in *Stewart* found that using the seized key to match the key to the vehicle did not constitute an unlawful search because the officers did not conduct an actual search of the inside of the vehicle "until after they had probable cause based on the canine dog's positive hit on the vehicle." *Stewart*, 315 F. App'x at 558 (citing *Illinois v. Caballes*, 543 U.S. 405, 409 (2005)). Thus, the Sixth Circuit held that because the officers had probable cause to search the vehicle, the subsequent search and seizure of controlled substances therein was lawful. *Stewart*, 315 F. App'x at 558.

In the case at hand, the search of the Acura SUV by the law enforcement operations team again mirrors the search in *Stewart* and demonstrates that, under the totality of the circumstances, the officers had probable cause to believe the vehicle contained methamphetamine. The officers in the matter at hand had even more of a basis for probable cause than the officers in *Stewart*, as they first identified Defendant Gaither as he drove the SUV and observed Defendant operate this vehicle to an agreed-upon location after phoning the Informant via a monitored phone call to arrange the sale of half a pound of methamphetamine. Just as the *Stewart* officers lawfully possessed the keys seized after the defendant's arrest, here the officers lawfully possessed the Acura key fob obtained from Defendant Gaither's pocket following his arrest. Thus, using the fob to lock the doors in an attempt to match the key with the Acura did not constitute an unlawful search. *See Salgado*, 250 F.3d 438, 456. Because no drugs were found on Defendant's person following the arrest, Officer Stine testified that therefore the officers had "a pretty good suspicion that the [methamphetamine] would be in the car." (R. 39, at 38). Based upon this chain of events,

the officers had more than a sufficient basis to believe there was probable cause to search the Acura SUV. Then, just as in *Stewart*, after matching the keys to the vehicle, the officers waited to search inside until after the K-9 dog's positive hit on the vehicle. *Stewart*, 315 F. App'x at 558. This additional fact further supported probable cause to search the vehicle. *See Nykoriak v. Wileczek*, 666 F. App'x 441, 445 (6th Cir. 2016) (quoting *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994)) (holding that positive indication by canine was "sufficient to establish probable cause for the presence of a controlled substance"). Accordingly, because the record demonstrates that Defendant has not satisfied his burden to show that the warrantless search of the SUV violated the Fourth Amendment, the second ground in support of his Motion to Suppress should be denied.

> **C. Suppression of evidence extracted from the mobile phones is not appropriate because continuation of the search past the execution date set forth on the face of the warrants was reasonable under the circumstances.**

Defendant further asserts that the evidence extracted from the mobile phones recovered in the May 23, 2017 operation should be suppressed. Though the evidence was extracted from the mobile phones pursuant to search warrants, Defendant points out that each warrant directed the Government "to execute this warrant on or before June 26, 2017." (R. 26-2, at 1; R. 26-3, at 1; R. 26-4, at 1; R. 26-5, at 1). Because the Government finalized execution of the warrants on June 27, 2017, Defendant argues that the warrants were unlawfully executed after the prescribed time frame. (R. 42, at 6). Defendant's argument, however, is not persuasive, as the record indicates that the Government's search extended past the execution date merely as a reasonable continuation of a timely search initiated within the time prescribed on the face of the warrants. Suppression is also inappropriate pursuant to the inevitable discovery doctrine, as the record indicates that the evidence inevitably would have been acquired through lawful means. Furthermore, the Government was authorized to conduct a later review of electronically stored information

contained in the phones pursuant to the express language of Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure.

First, suppression is unwarranted pursuant to the reasonable continuation doctrine. Pursuant to Fourth Amendment jurisprudence, a search conducted pursuant to a lawful warrant may last as long, and be as thorough, as reasonably necessary to fully execute the warrant under the circumstances. *United States v. Jackson*, 120 F.3d 1226, 1228-29 (11th Cir. 1997). Mere continuation of a search past the time set forth for execution does not engender suppression if the continuation is reasonable. *United States v. Gerber*, 994 F.2d 1556, 1559 (11th Cir. 1993).

In *Gerber*, officers initiated execution of a warrant to search the defendant's vehicle on a Friday, but did not look under the hood on that day because they were unable to locate the lever to open the hood. *Gerber*, 994 F.2d at 1558. Instead, the officers waited until the following Monday, at which time they were able to secure the assistance of a mechanic in opening the hood without damaging the vehicle. *Id.* The defendant conceded that the evidence obtained from the car's interior on Friday was seized legitimately pursuant to the search warrant; the defendant's only contention on appeal was that the evidence found under the hood on the following Monday should have been suppressed because the search occurred after the time prescribed for execution on the face of the warrant. *Id.* at 1558-59.

The Eleventh Circuit in *Gerber* concluded that the Government's search under the hood of the vehicle performed on the following Monday was a reasonable continuation of the original search for which the officers had a valid warrant, regardless of the passing of the time set forth for execution of the warrant over the weekend. Moreover, the *Gerber* court found it significant that the agents did not delay the search deliberately or in bad faith and were unaware that the time set forth for execution had passed. *Id.* at 1559. The court emphasized the fact that the decision to

23

suspend the search temporarily until a mechanic was available to open the car hood was a reasonable one in the face of an "unexpected obstacle" to the completion of their search. *Id.* at 156. *See also United States v. Keszthelyi*, 308 F.3d 557, 570 (6th Cir. 2002) (citing *Gerber* as "an excellent illustration of the kind of situation in which a second entry is properly characterized as a continuation of an earlier search").

In the case at hand, as in *Gerber*, the Government's manual search of the 3 incompatible mobile phones after the execution date set forth on the warrants satisfies the reasonable continuation rule. Just as in *Gerber*, continuation was reasonably necessary in light of an unexpected obstacle to the completion of the search. The warrants commanded the United States to execute on or before June 26, 2017. The Cellbrite program electronically extracted data from one phone, and the warrant was returned on June 14, 2017; however, law enforcement was not able to access the data from 3 of the 4 mobile phone devices when the Government unexpectedly discovered that its Cellbrite program was incompatible with the remaining 3 phones.

The testimony introduced at the evidentiary hearing further indicates that, as in *Gerber*, the delay was not the result of bad faith. Only two agents in the DEA office had the capability of utilizing the Cellbrite program. Once Agent Taylor learned of the incompatibility issue, he began to manually search the 3 phones. Agent Taylor testified that he cannot definitively state what day the phones were returned to him following the unsuccessful Cellbrite extraction, but stated that his search of the phones began within two weeks of the warrant being issued. His manual search was completed on June 27, 2017—only one day after the June 26, 2017 execution date set forth on the warrants. Like the *Gerber* officers, Agent Taylor testified that he did not know the execution date had passed. Accordingly, just as in *Gerber*, Agent Taylor's completion of the manual extraction

on June 27, 2017 was a reasonable continuation of the original search for which the officers had a valid warrant, and Defendant's Motion to Suppress should be denied.

Moreover, even if the reasonable continuation doctrine did not apply, suppression is still inappropriate. The inevitable discovery doctrine provides an exception to the exclusionary rule and allows even unlawfully obtained evidence to be admitted at trial if the Government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means had the government misconduct not occurred. *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984) ("if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury"). The inevitable discovery exception permits admission of the evidence if the Government can demonstrate (1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct; (2) that the police possessed the leads making the discovery inevitable at the time of the misconduct; and (3) that the police were actively pursuing an alternate line of investigation prior to the misconduct. *Kennedy*, 61 F.3d 494, at 499.

The 3-part test set forth in *Kennedy* supports a finding that the inevitable discovery doctrine provides an exception to the exclusionary rule in the case at hand. First, there is a reasonable probability that the data seized during Agent Taylor's search inevitably would have been discovered during the lawful execution of a second search warrant. Defendant has not disputed that probable cause existed to authorize search of the 4 phones at the time the warrants were issued. The phones were secured in police custody during the entire relevant time period, and the circumstances giving rise to probable cause did not change. As a result, probable cause continued

to exist for the search of the phones.  The United States could have extracted the data in a lawful manner by restating the facts in the prior affidavit and obtaining a new warrant with an extended time period to obtain the same information.

The second and third *Kennedy* factors also weigh against suppression.  The Government possessed the necessary leads to obtain the data by the date set forth in the warrants; the delay had merely been caused by internal factors—namely, the incompatibility between the seized phones and the Government's Cellbrite software.  Finally, the police were actively pursuing an alternate line of investigation.  Once Agent Taylor discovered the incompatibility issue, he changed the method of extraction and began the more time-consuming task of manually extracting data from the phones by photograph.  As a result, the deterrence rationale does not apply under these circumstances; the United States gained no advantage by the delay, and there is no rational basis to keep the evidence from the jury in order to ensure fairness of trial proceedings.  *See Kennedy*, 61 F.3d at 497.  Accordingly, because the evidence inevitably would have been acquired through lawful means had the Government's purported misconduct not occurred,[7] the inevitable discovery doctrine applies.

Finally, suppression is inappropriate because the express language of the Federal Rules of Criminal Procedure authorizes a later review of electronically stored information.  Generally, search warrants issued by federal courts must require execution within 14 days.  Fed. R. Crim. P. 41(e)(2)(A).  However, Rule 41 also provides that "[a] warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored

---

[7] As the Eleventh Circuit pointed out in *Gerber*, the Court cautions that such a result does not serve as a precedent for "careless attention to the acquisition of warrants, including their duration."  *Id.* at 1561 n.4.  Rather, "[t]he government should use caution to follow the dictates of Rule 41 explicitly."  *Id.*  Pursuant to the circumstances of this case, however, "this inadvertent, technical violation of Rule 41 should not preclude key incriminating evidence for which a valid warrant based on abundant probable cause was obtained."  *Id.*

information.  Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant."  Fed. R. Crim. P. 41(e)(2)(B).  Distinguishing on-site searches such as the search of the vehicle in *Gerber* from off-site searches of electronically stored information, the rule clarifies that "[t]he time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review."  *Id.*  The Advisory Committee notes to the 2009 amendments to Rule 41 explain the need for such a procedure, noting that  "[c]omputers and other electronic storage media commonly contain such large amounts of information that it is often impractical for law enforcement to review all of the information during execution of the warrant at the search location." Fed. R. Crim. P. 41(e) advisory committee's note to 2009 amendment.  Thus, Rule 41 "acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant."  *Id.*; *see also United States v. Hamilton*, 16-20062, 2017 WL 1376586, at *6 (E.D. Mich. Apr. 11, 2017).

Applying Rule 41(e)(2)(B), the U.S. District Court for the Eastern District of Pennsylvania rejected a similar argument in *United States v. Winther*, 11-212, 2011 WL 5837083, at *10 (E.D. Pa. Nov. 18, 2011).  In *Winther*, the government obtained a warrant to search the defendant's computer.  *Id.*  The face of the warrant stated "[y]ou are hereby commanded to search on or before March 24, 2011."  *Id.*  Because the government's forensic analysis of the defendant's computer occurred sometime between March 22, 2011, and May 11, 2011, the defendant argued that the warrant was not executed within the 14-day time period specified on the warrant and therefore the government violated the Fourth Amendment, warranting suppression of the evidence obtained from the computer.  *Id.*  Rejecting the defendant's argument that the search warrant required the

analysis of the computer to be completed by March 24, 2011, the *Winther* court held that under

revised Rule 41(e)(2)(B), the warrant "need only be executed within a reasonable time after its

issuance" pursuant to the Fourth Amendment, "notwithstanding the presence of 'forthwith'

language in the warrant" imposing a 14-day limitation).  Finding the forensic analysis was

completed within a reasonable time, the *Winther* court denied the defendant's motion to suppress.

*See also United States v. Bedford*, 519 F.2d 650, 655 (3d Cir. 1975) ("Timeliness of execution

should not be determined by means of a mechanical test with regard to the number of days from

issuance, nor whether any cause for delay was per se reasonable or unreasonable.  Rather it should

be functionally measured in terms of whether probable cause still existed at the time the warrant

was executed.").

    Here, as in *Winther*, Defendant's argument that the Government was required to finalize

execution of the warrants within 14 days of their issuance contradicts the plain language of Rule

41(e)(2)(B).  The Government's affidavit submitted with the warrant requests indicated that the

phones were capable of serving as "a wireless telephone, digital camera, portable media player,

and a GPS navigation device."  (*See, e.g.*, R. 26-2, at 14).  Such devices fall within the type of

"electronic storage media" contemplated by the 2009 Advisory Committee notes which contain

such large amounts of information that an on-site review is impractical.  As a result, the

Government specifically requested forensic examination of electronically stored data "consistent

with Rule 41(e)(2)(B)." (*See, e.g.*, R. 26-2, at 14).  Though the record is not entirely clear as to the

precise date Agent Taylor learned the Cellbrite software was incompatible with the phones, the

record does indicate that the time period at issue was not the result of intentional delay but rather

the result of software complications that arose attendant to forensic analysis of electronic storage

media.  Thereafter, the Government finalized execution of the warrants in a prompt manner—

28

indeed, much closer to the 14-day time period than the process in *Winther*. Agent Taylor finalized execution only one day after the 14-day time period set forth on the face of the warrant. The record supports a finding that the time period was reasonable under the circumstances, and Defendant has failed to meet his burden to demonstrate his Fourth Amendment rights were violated. *Richards*, 659 F.3d at 535. Accordingly, Defendant's third basis for his Motion to Suppress should be denied.

###### D. Suppression of evidence obtained from the search of Shahana Hollon's residence is not appropriate because the Government satisfied its burden to demonstrate that Ms. Hollon's consent was voluntary.

Finally, Defendant asserts that the evidence obtained from the search of Shahana Hollon's apartment on May 23, 2017 should be suppressed because Ms. Hollon's consent was the product of coercion and not given voluntarily.[8] "It is the government's burden, by a preponderance of the evidence, to show through clear and positive testimony" that Ms. Hollon's valid and voluntary consent to the search was obtained. *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999); *see also United States v. Scott*, 578 F.2d 1186, 1188-89 (6th Cir. 1978) (government bears burden of proving, "by clear and positive testimony," that consent was voluntary, unequivocal, specific and intelligent); *see also United States v. Buckingham*, 433 F.3d 508, 514 (6th Cir. 2006).

The Fourth Amendment protects citizens against unreasonable searches and seizures, and generally prohibits warrantless searches of homes. *See United States v. Haddix*, 239 F.3d 766, 767 (6th Cir. 2001). This general prohibition does not apply, however, where the police obtain voluntary consent from the individual whose property is searched or from a third party who possesses common authority over the premises. *See United States v. Gillis*, 358 F.3d 386, 390 (6th

---

[8] It is undisputed that Ms. Hollon had the *authority* to consent to the search of her own apartment. A third party occupant may consent to a search so long as the consenting individual "possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). *See also United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008)).

Cir. 2004); *United States v. Salvo*, 133 F.3d 943, 953 (6th Cir. 1998). The determination of whether consent to search is either voluntary or the product of duress or coercion is a question of fact to be determined from the totality of all the circumstances. *United States v. Ables*, 280 F. App'x 513, 516 (6th Cir. 2008) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *see also United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999)). In weighing the voluntariness of consent under the circumstances, a district court should examine "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *Ables*, 280 F. App'x at 516 (citing *Worley*, 193 F.3d at 386).

The Sixth Circuit determined that the Government met its burden to demonstrate a valid and voluntary consent to search in *United States v. Ayoub*, 498 F.3d 532, 536 (6th Cir. 2007) (affirming the district court's finding that a defendant's adult daughter voluntarily consented to the search of her parents' home). In *Ayoub*, the Department of Homeland Security received information that the defendant was engaged in drug activity at his parents' house; his parents, the owners of the home, were in Lebanon. *Id.* at 535-36. The defendant was searched during a traffic stop, but the police found no contraband and he was allowed to leave. *Id.* at 536. Police then spoke with the defendant's half-sister, who served as a caretaker of her parents' home while they were in Lebanon, to seek her consent to search the home. *Id.* Law enforcement officers testified at an evidentiary hearing that the daughter's demeanor was cooperative and understanding, and she did not appear upset or distraught. *Id.* at 542. The officers testified that no threats were made. *Id.* The officers further testified that the daughter agreed to sign a consent form and provided a key to the home; though her ability to speak English was limited, the officers testified that she

nodded her head in understanding, stated that she understood, and that she could speak and write in English. *Id.* Under these circumstances, the Sixth Circuit upheld the trial court's finding that the daughter's consent was voluntarily given, not the result of threat or coercion. *Id. See also United States v. Johnson*, 109 F. App'x 76, 78 (6th Cir. 2004) (holding a defendant's consent to search his residence was voluntary when the defendant stated "if you need to do that, that is fine" and had no problems communicating, no weapons were drawn, no threats were made, and the officers spoke in a cordial manner).

In contrast, the Sixth Circuit determined that the Government did not meet its burden of proving that the defendant's consent was voluntarily given in *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998). The *Ivy* court found that multiple factors indicated the defendant's consent to a search of his home was coerced. The defendant and his girlfriend testified at his suppression hearing. The defendant testified that the search took several hours, and over an hour passed between the officers' initial request for his consent and the defendant's ultimate decision to sign the consent form. *Id.* at 402. The Sixth Circuit further determined that the police officers used unlawful threats regarding the defendant's family in order to secure the defendant's consent, based upon the district court's finding that the officer "made statements to the effect that if Ivy did not sign a consent form, everyone in the house, including Ivy's girlfriend, Jones, would go to jail, and that Ivy and Jones' child would be taken into government protective custody." *Id.* at 402. Furthermore, the defendant testified that during this time, officers had removed Jones's infant child from her arms and then handcuffed Jones to the kitchen table by her legs. *Id.* at 400. Jones testified that when she refused to sign a consent to search form, the officer told her that refusal to sign would mean "the police would take her child away, that she would no longer be able to see the child and that she would go to jail." *Id.*

31

The Sixth Circuit rejected the Government's argument that the officer's statements were lawful references to the fact that the officers could obtain a search warrant. *Id.* at 403. While acknowledging that it is true that an agent's statements to the effect that he would obtain a search warrant if the suspect did not consent to the search does not taint the suspect's consent to a search, the agent's remarks "went far beyond a mere reference to the fact that he could obtain a warrant. Rather, he explicitly stated that if Ivy did not sign the form, he would arrest Ivy's girlfriend and take away their small child." *Id.* (citing *Salvo*, 133 F.3d at 953). The Sixth Circuit further found that the officer's statements "were not merely informative, but were specifically calculated to induce fear and apply pressure." *Id.* The Sixth Circuit explained that "[t]he intimidating nature of [the officer's] statement is particularly striking when one considers that [the officer] not only threatened to arrest [the girlfriend], but also to take Ivy and Jones' child from their custody." *Id.* The Court noted that "[e]ven if [the officer] was correct in that both parents were about to be arrested and taken to jail, there were supervision alternatives to state custody, such as having the child stay with a friend or relative." *Id.* The Sixth Circuit concluded that the officer's statement "indicates that [he] was not merely trying to provide Ivy with data upon which to base his decision to consent, but rather was attempting to overcome Ivy's resolution *not* to consent." *Id.* (emphasis in original). As a result, the officer's "threat to arrest Jones and, especially, to take her child thus constituted an objectively improper police action . . . significantly intensifying the coercive tenor of the request for consent." *Id.* Under the totality of the circumstances, the *Ivy* court stated that it was "left with the definite and firm conviction that a mistake has been committed." *Id.* at 403 (citing *United States v. Gypsum*, 333 U.S. 364, 395 (1948)).

In the matter at hand, the record indicates that there was no evidence of overt duress or coercion. Examining Ms. Hollon's age, intelligence, and education, her understanding of the right

to refuse to consent, her understanding of her constitutional rights, the length and nature of detention, and the use of coercive or punishing conduct by the police, these factors all weigh against suppression. *See Ables*, 280 F. App'x at 516. As in *Ayoub*, there is no evidence that Ms. Hollon was of insufficient age, education, or intelligence to understand her rights; nor is there evidence that Ms. Hollon failed to understand either the officers' questions or the nature of the request to search her residence. Moreover, unlike the circumstances in *Ivy*, 165 F.3d at 404, there was no lengthy detention and interrogation; rather, as in *Ayoub*, the officers' testimony at the evidentiary hearing indicated that the officers spoke in conversational tones and attempted to conduct the search in an expeditious manner.

Further, like the daughter in *Ayoub*, Ms. Hollon gave verbal, unequivocal consent to allowing the officers inside and showing them the box; subsequently, in consenting to the further search by the K-9, Ms. Hollon confirmed her consent by signing the written consent form provided by Agent Taylor. The form Ms. Hollon signed indicated that the search was being conducted at Ms. Hollon's freely-given consent; it also contained a statement that she had not been threatened or forced in any way. Moreover, Ms. Hollon was even more active in assisting police than the daughter in *Ayoub*, who merely provided a key to the home; Ms. Hollon volunteered information regarding the items in the apartment allegedly belonging to Defendant and directed the officers to those items in the bedroom closet. The box located in this closet was the only item seized from the officers' search of the home.

Defendant argues, however, that Ms. Hollon's consent was not voluntary but coerced by a veiled threat. When the officers arrived at Ms. Hollon's apartment at approximately 9:00 p.m. on May 23, 2017, she and her two children were the only occupants. At the evidentiary hearing, Agent Taylor testified that at some point during their interview of Ms. Hollon and search of her

apartment, the officers told Ms. Hollon that "if she was found to be in possession of narcotics there at the house, the Cabinet would be involved at that point to take possession of the children, because she was the only adult there at the house." (R. 39, at 77-78). Defendant argues that this discussion "tainted any consent" by Ms. Hollon, as "it could be implied as a threat to remove the children if she was not cooperative." (R. 42, at 6). In response, the Government's post-hearing brief contends that "references to possible consequences in the event of refusal do not invalidate consent when those consequences are legitimate." (R. 43, at 4 (citing *United States v. Salvo*, 133 F.3d 943, 954 (6th Cir. 1998) (finding officer's statements were lawful references to the fact that officers could obtain a search warrant)).

The Court does not take Defendant's position lightly, and cautions the Government that it does not look favorably upon the similarities, at first glance, between the child custody threat in *Ivy* and the matter at hand. This is a close question because Agent Taylor's statement that the state would take possession of Ms. Hollon's children if she was found to be in possession of narcotics echoes the officers' statements in *Ivy* to the effect that if the *Ivy* defendant did not sign a consent form, the child would be taken into government protective custody. *Ivy*, 165 F.3d at 402. However, the evidence before the Court indicates that Ms. Hollon's consent to the search was voluntary, and under the totality of the circumstances, the search in the case at hand is more similar to the voluntary consent in *Ayoub*, 498 F.3d 532, than the coerced consent in *Ivy*, 165 F.3d 397.

The Sixth Circuit in *Ivy* found "overwhelming evidence of coercion and intimidation employed by the police in obtaining Ivy's signature on the consent form." *Id.* at 402. The officers in *Ivy* inflicted duress upon the defendant and his girlfriend over a number of hours. Prior to giving his consent, the defendant observed the scene of officers tearing his child from its mother's arms and handcuffing the mother to a chair. The officers further sought to persuade consent by telling

34

the mother that, not only would her child be taken into protective custody, but that she would no longer be able to see the child unless she consented to the search.

In contrast, the officers in the case at hand sought Ms. Hollon's cooperation and attempted to conduct the search in a timely manner, with minimal obtrusiveness. Agent Taylor testified that "we was hoping to further this investigation, so we wanted to keep it as low key as possible, to see if she wanted to cooperate. So I wasn't trying to make a big scene out of it. I didn't want to be there for any longer period than need be." (R. 39, at 78-79). Though four officers reported to Ms. Hollon's apartment, two of them remained a distance away and out of view when Agent Taylor and Supervisor Stine approached the front door. The officers informed Ms. Hollon that they did not think that she was involved. Moreover, Officer Taylor's reference to potential protective custody of her children was conditional not upon Ms. Hollon's consent, as in *Ivy*, where the officers told the defendant his children would be taken away if he did not consent to the search; rather, Officer Taylor's statement was conditional upon Ms. Hollen's potential possession of narcotics. No narcotics were found in the home. The evidence before the Court indicates that Agent Taylor's statement, under the totality of the circumstances, provided Ms. Hollon with data upon which to base her decision to consent as opposed to an attempt to overcome her resolution not to consent. Accordingly, the Court is not "left with the definite and firm conviction that a mistake has been committed." *Ivy*, 165 F.3d at 403. The Government has met its burden of proving by clear and positive testimony that Ms. Hollon's consent to the search of her residence was untainted by duress or coercion, and Defendant's Motion to Suppress based on lack of valid consent should be denied.

## III.    Conclusion and Recommendation

The evidence and testimony presented at the evidentiary hearing, as well as the evidence set forth in the record, demonstrate that Defendant Gaither's constitutional rights were not violated,

35

and his Motion to Suppress should be denied.  Accordingly, for the reasons stated herein, **IT IS RECOMMENDED** that Defendant's Motion to Suppress (R. 21) be **denied**.

Specific objections to this Report and Recommendation must be filed within fourteen (14) days of the date of service or further appeal is waived.  28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(2); *Thomas v. Arn*, 728 F.2d 813, 815 (6th Cir. 1984), *aff'd*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Dated this 17th day of January, 2018.



Signed By:
*Candace J. Smith*
United States Magistrate Judge

J:\DATA\Orders\criminal cov\2017\17-15-DLB-CJS mot to suppress R&R.final.docx