CRIMINAL ACTION NO. 17-15-DLB-CJS

UNITED STATES OF AMERICA                                                    PLAINTIFF

V.                    ORDER ADOPTING REPORT AND RECOMMENDATION

FRANK LAMAR GAITHER                                                DEFENDANT

* * * * * * * * * * * * * *

This matter is before the Court upon Defendant Frank Lamar Gaither's Motion to Suppress (Doc. # 21), and Magistrate Judge Candace J. Smith's Report and Recommendation ("R&R"), wherein she recommends that Defendant's Motion to Suppress be denied. (Doc. # 44). The Defendant having filed Objections to the R&R (Doc. # 45), and the Government having responded to the Defendant's Objections (Doc. # 47), the Motion is ripe for the Court's review. For the reasons that follow, the Defendant's Objections are **overruled**, the R&R is **adopted**, and Defendant's Motion to Suppress (Doc. # 21) is **denied**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In February 2017, the United States Drug Enforcement Administration ("DEA") and local law enforcement began investigating methamphetamine distribution and trafficking in northern Kentucky. (Doc. # 3 at 2). With the assistance of a confidential informant, the investigation turned to the Defendant. *Id.* Specifically, the Informant told Agent Shannon Taylor, a detective with the Boone County Sheriff's Department assigned to the DEA as a federal task-force officer, that he or she had purchased methamphetamine and heroin

from an individual known as "Frank" on multiple occasions within the preceding six months. *Id*. The Informant also provided a physical description of "Frank" and described two vehicles "Frank" drove—a dark blue Honda and a maroon SUV. *Id*. Armed with this information, Agent Taylor conducted an independent investigation. *Id*. Agent Taylor was able to identify "Frank" as the Defendant Frank Lamar Gaither and the Informant positively identified the Defendant from an April 2017 arrest photograph. *Id*. Additionally, Agent Taylor obtained motor-vehicle records and confirmed that a maroon Acura SUV was registered to Defendant's mother. (Doc. # 39 at 48:12-22). DEA surveillance units also observed the Defendant sitting in a maroon Acura SUV. (Doc. # 3 at 3).

On May 23, 2017, Agent Taylor met with the Informant and another task-force officer to set up a controlled buy of methamphetamine. *Id*. The Informant made contact with the Defendant by phone and arranged the purchase of a half-pound of methamphetamine. *Id*. During that conversation, the Defendant indicated that he had access to additional amounts of methamphetamine, *id.*, and further agreed to sell the Informant heroin. (Doc. # 39 at 50:21-51:9). The Informant and the Defendant also agreed on a time and place for the transaction—7:00 p.m. at a gas station in Covington, Kentucky. *Id*. at 15:17-21. The Informant's phone calls with the Defendant were monitored by Agent Taylor, who was able to hear both sides of the conversation and transmitted that information to his fellow agents and officers. *Id*. at 49:20-50:8.

After the controlled buy was scheduled, the law-enforcement team planned to arrest the Defendant when he arrived at the agreed-upon location for the drug transaction. *Id*. at 55:14-18. DEA Supervisor Brian Stine oversaw and assisted Agent Taylor in planning and executing the operation. *Id*. at 12:17-13:3. At the law-enforcement briefing,

the agents and officers were provided with an operational plan, which contained the April 2017 arrest photograph of the Defendant, as well as a description of the maroon Acura SUV and its license plate number. *Id.* at 13:4-14:15.

In advance of the controlled buy, a DEA agent was conducting surveillance in Cincinnati, Ohio, where he observed the Defendant in an Acura SUV, matching the vehicle description and license plate information gathered by the law-enforcement team. *Id.* at 48:23-49:15. Upon locating the vehicle on Windsor Street, it left that location and proceeded to Covington, Kentucky. *Id.* at 30:19-22. The surveillance unit followed. *Id.*

Shortly thereafter, the maroon Acura SUV was spotted leaving the agreed-upon gas station and traveling down Madison Avenue in Covington, Kentucky. *Id.* at 15:22-16:6. As the SUV traveled through Covington, it was trailed by two surveillance units—Supervisor Stine's unmarked vehicle and Covington Police Officer Ryan Malone's marked cruiser. *Id.* at 16:3-14. The SUV then turned left onto Alexandria Avenue and pulled into the parking lot of Bob's Food Mart. *Id.* at 16:7-10. At that time, the Defendant called the Informant and changed the location of the transaction to Bob's Food Mart, on the corner of Madison and Alexandria Avenues. *Id.* at 18:25-19:14; 54:6-9; 55:4-12.

Supervisor Stine continued on with traffic and then circled back to resume surveillance of the Defendant. *Id.* at 16:15-20. As Supervisor Stine passed by, he observed the Defendant exit Bob's Food Mart. *Id.* at 16:21-17:2. Supervisor Stine proceeded down Madison Avenue for a brief time before turning his unmarked vehicle around again. *Id.* at 16:22-24. After turning around, Supervisor Stine observed the Defendant get back into the SUV, leave Bob's Food Mart, and drive down Alexandria Avenue. *Id.* at 16:23-17:9. Supervisor Stine followed the Defendant onto Alexandria

Avenue, where both he and the Defendant parked their vehicles. *Id.* at 17:5-14. Supervisor Stine observed the Defendant exit and lock the SUV, and then walk down Madison Avenue towards Bob's Food Mart and an ice-cream shop. *Id.* at 17:15-18:4. During the surveillance of the Defendant, the law-enforcement team communicated with each other via radio transmissions. *Id.* at 14:18-20; 19:3-4; 34:11-17; 54:14-55:9.

After Supervisor Stine informed the other officers and agents that the Defendant had exited the SUV and was walking towards Bob's Food Mart and the ice-cream shop, Agent Taylor called out for one of the uniformed cruisers to stop and arrest the Defendant. *Id.* at 18:2-8. Because the uniformed cruisers were not close enough, Supervisor Stine pursued the Defendant and arrested him at the entrance of the ice-cream shop. *Id.* at 18:6-16. Supervisor Stine informed the Defendant that he was under arrest, handcuffed him, patted him down, and gave him *Miranda* warnings. *Id.* at 21:11-22:7. The officers then emptied the Defendant's pockets, which contained an Acura key fob. *Id.* at 37:7-25.

During the Defendant's arrest, Agent Taylor drove by with the Informant, who identified the Defendant as "Frank." *Id.* at 56:1-8. Following the arrest, Supervisor Stine and the assisting officers put the Defendant in a cruiser and drove him back to Alexandria Avenue—approximately 100 yards away—where the SUV was parked. *Id.* at 22:8-15. Because the Defendant denied possessing or driving the SUV, Supervisor Stine activated the lock and unlock features on the key fob and confirmed that it matched the maroon Acura SUV. *Id.* at 37:19-38:4; 39:14-40:4. Neither Supervisor Stine nor the other officers searched the SUV at that time. *Id.* at 40:5-8. Instead, they waited for Agent Taylor to arrive on the scene with his K-9 unit. *Id.* at 40:8-10. The K-9 was given a search command and walked around the SUV. *Id.* at 58:20-24. The K-9 alerted to the presence

of a narcotic odor on two parts of the SUV: the rear passenger door on the driver's side and the driver's door. *Id.* at 59:4-24.

The law-enforcement team then unlocked the SUV and conducted a search of the vehicle. *Id.* at 40:8-10; 60:9-18. The search revealed a plastic bag containing eight individual baggies of a crystalline substance, which was identified as crystal methamphetamine; a plastic bag containing four individual baggies of a brown chucky substance, which was identified as heroin; three cellphones; and a cellphone charger. (Docs. # 3 at 4; 26-2 at 10). After the search of the SUV, Agent Taylor advised the Defendant of his *Miranda* rights and questioned him about the illegal contents of the vehicle. (Docs. # 3 at 4; 39 at 74:1-9). The Defendant maintained that the vehicle was not his and denied any knowledge regarding its contents. (Docs. # 26-2 at 10; 39 at 74:11-17; 75:11-14). Defendant was then removed from the scene and transported to the Kenton County Detention Center. (Docs. # 3 at 4; 39 at 23:17-18).

Later that evening—at approximately 9:00 p.m.—Agent Taylor, Supervisor Stine, and two other officers traveled to the apartment of Shahana Hollon, in Florence, Kentucky. (Doc. # 39 at 23:19-24:1; 60:19-22). Agent Taylor's prior investigation had uncovered that Ms. Hollon and the Defendant had a child in common and that the Defendant occasionally stayed at Ms. Hollon's apartment. *Id.* at 41:7-12; 77:1-10. Agent Taylor and Supervisor Stine approached the front door, while the other officers stood at the corner of the driveway. *Id.* at 76:5-10.

Upon making contact with Ms. Hollon, Agent Taylor and Supervisor Stine explained that the Defendant had been arrested and discovered with a large amount of narcotics, and while they did not believe she was involved, they wanted to confirm that

the Defendant was not keeping anything related to the investigation inside the residence. *Id.* at 62:1-6. When asked if she was aware of anything illegal inside the home, Ms. Hollon indicated that she was unsure, but did know that the Defendant kept a box in his closet. *Id.* at 25:2-6. Supervisor Stine then asked Ms. Hollon if she would be willing to take the officers inside and show them the box. *Id.* at 25:9-10. Ms. Hollon agreed and led the officers to a bedroom upstairs. *Id.* at 25:10-14. At some point during this exchange, Agent Taylor mentioned possible involvement of the Cabinet for Health and Family Services. *Id.* at 77:14-78:6. Specifically, Agent Taylor testified at the evidentiary hearing that he warned Ms. Hollon that "if she was found to be in possession of narcotics there at the house, the Cabinet would be involved at that point to take possession of the children, because she was the only adult there at the house." *Id.* at 77:22-78:1.

Once the officers and Ms. Hollon were upstairs, Ms. Hollon opened the closet door and pointed the officers to a white box on the top shelf. *Id.* at 25:14-17; 63:11-12. Supervisor Stine pulled the box down, opened it, and found drug paraphernalia and two cellphones. *Id.* at 25:18-19. After discovering this evidence, the officers asked Ms. Hollon to consent to a further search of the residence. *Id.* at 63:18-64:8. Ms. Hollon consented and signed a consent-to-search form. (Doc. # 26-1). To speed up the process, Agent Taylor asked Ms. Hollon if he could bring his K-9 into the apartment to search for narcotics. *Id.* at 78:12-18. Ms. Hollon agreed and the K-9 performed a search of the apartment, but no other illegal substances were found. *Id.* at 42:1-19.

The next day—on May 24, 2017—the Defendant was charged in a federal criminal complaint. (Doc. # 3). A federal Indictment followed on June 8, 2017.[1] (Doc. # 9).

---

[1] A Superseding Indictment was returned against the Defendant on October 12, 2017. (Doc. # 35). The Superseding Indictment charges the Defendant with one count of conspiracy to

On June 12, 2017, Agent Taylor applied for, and a Magistrate Judge in the Southern District of Ohio issued, four search warrants to extract electronically stored information from the cellphones seized during the investigation. (Docs. # 26-2, 26-3, 26-4, and 26-5). Pursuant to Federal Rule of Criminal Procedure 41, the warrants commanded the United States to execute the warrants within fourteen days—on or before June 26, 2017. *Id.* The Cellbrite program, which electronically extracts data from cellphones, was successful in extracting data from one of the cellphones. *Id.* The other three phones, however, were incompatible with the Cellbrite program. *Id.* For those three phones, Agent Taylor conducted manual searches and took photographs of the displayed contents, including text messages and other data. (Doc. # 39 at 85:13-86:1). Agent Taylor testified at the evidentiary hearing that the manual search took him a couple of days and he completed the search of the cellphones on June 27, 2017. *Id.*

The Defendant filed the instant Motion to Suppress on July 26, 2017, seeking suppression of the evidence recovered from his May 23, 2017 arrest, including the evidence obtained from the search of his person, the Acura SUV, and Ms. Hollon's apartment. (Doc. # 21). The Defendant also seeks suppression of the evidence obtained from the officers' search of the cellphones. *Id.*

The Defendant's Motion to Suppress was referred to Magistrate Judge Smith for the preparation of an R&R. After the Government filed its response (Doc. # 26), Magistrate Judge Smith held an evidentiary hearing on September 29, 2017. (Doc. # 32). Following the evidentiary hearing, the parties submitted supplemental briefing. (Docs. #

---

distribute controlled substances, two counts of possession of actual methamphetamine with intent to distribute fifty grams or more, and one count of possession of controlled substances with intent to distribute, all in violation of 21 U.S.C. § 841(a)(1). *Id.*

42 and 43). On January 17, 2017, Magistrate Judge Smith entered her R&R, wherein she recommends that the Defendant's Motion to Suppress be denied in full. (Doc. # 44). The Defendant having filed Objections to the R&R (Doc. # 45), and the Government having filed its response to those objections (Doc. # 47), this matter is now ripe for the Court's review.

## II.    ANALYSIS

### A.    Standard of Review

Pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Criminal Procedure 59, a district court may refer a motion to suppress to a magistrate judge for the preparation of a report and recommendation. "The magistrate judge must promptly conduct the required proceedings and enter on the record a recommendation for disposing of the matter, including any proposed finding of fact." Fed. R. Crim. P. 59(b)(1). If a party files timely objections to the recommendation, the district court must consider those objections *de novo* and "accept, reject, or modify the recommendation." Fed. R. Crim. P. 59(b)(3). Failure to object to a Magistrate Judge's findings or conclusions results in waiver of those objections. Fed. R. Crim. P. 59(b)(2).

The objections must be specific, however. "[V]ague, general or conclusory objections" are "tantamount to a complete failure to object." *Cole v. Yukins*, 7 F. App'x 354, 356 (6th Cir. 2001) (citing *Miller*, 50 F.3d at 380). Moreover, "an 'objection' that does nothing more than state a disagreement with a magistrate judge's suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context." *United States v. Vanover*, No. 2:10-cr-14-DLB, 2017 WL 1356328, *1 (E.D. Ky. Apr. 11, 2017) (quoting *VanDiver v. Martin*, 304 F. Supp. 3d 934,

938 (E.D. Mich. 2004)).

The Defendant has raised four objections to the Magistrate Judge's R&R.[2]  (Doc. # 45).  First, the Defendant claims that his arrest was not supported by probable cause.  *Id.* at 1-4.  Second, and building on his unlawful-arrest argument, the Defendant argues that the search of the SUV was unlawful for two reasons: (1) without a lawful arrest, the officers could not perform a legitimate search incident to arrest and thus, Supervisor Stine did not lawfully possess the key to the Acura, and (2) the automobile exception to the warrant requirement is inapplicable in this case.  *Id.* at 5-6.  Third, the Defendant argues that the officers coerced Ms. Hollon into consenting to the search of her apartment, and therefore, the evidence discovered at her home must be suppressed.  *Id.* at 8-9.  Fourth, the Defendant claims that the evidence obtained from the officers' search of the cellphones seized during the investigation must be suppressed because the warrant had expired before the data was extracted.  *Id.* at 6-8     The Court will address each of the Defendant's Objections in turn.

## B.    The Defendant's arrest was supported by probable cause.

"The Fourth Amendment, which applies to the states through incorporation by the Fourteenth Amendment, protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 358 (6th Cir. 2013) (citing U.S. Const. amend. IV).  A

---

[2]     In his Objections, the Defendant attempts to lodge a general objection to the entirety of the R&R.  (Doc. # 45 at 1) ("As an initial matter, the Defendant objects to the Report and Recommendation and hereby incorporates all previous filings of record in support of the argument that the evidence seized in this matter should be suppressed as a matter of law.  In addition to the arguments set forth therein Defendant Gaither specifically addresses certain errors…").  This "objection," however, is vague, merely states a disagreement with the R&R, and incorporates previous arguments, and thus, amounts to no objection at all.

"warrantless arrest" is "reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Thus, whether an arrest is "constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

The "probable-cause standard is a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Illinois v. Gates*, 426 U.S. 213, 231 (1983)). "To determine whether an officer had probable cause to arrest an individual, [courts] examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Id.* at 371 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "While probable cause means that 'officers must show more than mere suspicion, the probable cause requirement does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt.'" *United States v. Romero*, 452 F.3d 610, 616 (6th Cir. 2006) (quoting *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998)).

The Defendant argues that the R&R's conclusion that the officers had probable cause to arrest him is unsupported by the record. (Doc. # 45 at 1-4). The Court disagrees.

Prior to arresting the Defendant, the "officers knew of several significant incriminating circumstances suggesting that [the Defendant] was involved in narcotics trafficking, and the totality of these factors would lead a reasonable person to determine that there was a reasonable probability that illegality had occurred or was about to occur." *Romero*, 452 F.3d at 616. Specifically, the officers worked with an Informant, who had previously purchased methamphetamine and heroin from an individual he knew as "Frank," and set up a controlled buy of narcotics. (Doc. # 3 at 2). The Informant also provided officers with a physical description of "Frank" and his vehicles, which included a maroon SUV. *Id.* Agent Taylor then conducted an independent investigation, identifying the Defendant Frank Lamar Gaither as "Frank" and confirming that a maroon Acura SUV was registered to the Defendant's mother. *Id.* at 3.

To schedule the controlled buy, the Informant called the Defendant and arranged the purchase of a half-pound of methamphetamine. *Id.* The Informant and the Defendant also agreed on a time and place for the transaction—7:00 p.m. at a gas station in Covington, Kentucky. (Doc. # 39 at 15:17-21). Agent Taylor and another officer monitored this call and Agent Taylor was able to listen to both sides of the conversation in real time. *Id.* at 49:20-50:8.

The law-enforcement team then began surveillance of the Defendant. The Defendant was first spotted in the maroon Acura SUV in Cincinnati, Ohio. (Doc. # 39 at 48:23-49:15). Officers also observed the Defendant at the agreed-upon gas station in Covington, Kentucky. *Id.* at 15:22-16:6. While being trailed, the Defendant left the gas station and proceeded to Bob's Food Mart. *Id.* at 16:3-14; 30:19-22. After pulling into Bob's Food Mart's parking lot, the Defendant called the Informant and changed the

location of the transaction to Bob's Food Mart. *Id.* at 18:25-19:14; 54:6-9; 55:4-12. The Defendant pulled out of Bob's Food Mart's parking lot, parked the SUV nearby, exited the vehicle, and began walking towards Bob's Food Mart and an ice-cream shop. *Id.* at 17:15-18:4. Officers then arrested the Defendant.[3] *Id.* at 18:6-16.

Put simply, the "events leading up to the [Defendant's] arrest … viewed from the standpoint of an objectively reasonable police officer," establish sufficient probable cause. *Romero*, 452 F.3d at 615. The "corroboration of a certain amount of information provided by an informant can be sufficient to establish probable cause to arrest and search a criminal suspect." *Strickland*, 144 F.3d at 417. Here, the Informant provided substantial incriminating information and scheduled a controlled buy with the Defendant, while the Agent Taylor listened to both sides of the conversation. The Informant's information was continually corroborated throughout the course of the day—the officers identified the Defendant via an arrest photo, confirmed that a maroon Acura SUV was registered to his mother, spotted him at the agreed-upon gas station, watched him drive to Bob's Food Mart at the same time that the Informant got a call changing the transaction location to Bob's Food Mart, and then observed him park his car and walk towards Bob's Food Mart.

Despite the Defendant's argument to the contrary, it does not matter that the officers never witnessed the Defendant engage in "any actual illegality." *Strickland*, 144 F.3d at 417 (holding that a detailed tip from an informant, whose details were substantially corroborated by subsequent police observation supported probable cause even though

---

[3]     The Court highlights that the Informant's second positive identification of the Defendant, which occurred after the Defendant's arrest, is omitted from the Court's discussion. As the Defendant correctly argues in his Objections, that fact cannot support a finding of probable cause because it occurred after the arrest. (Doc. # 45 at 2-4). Thus, the omission is purposeful, but it is of no consequence. Even if the Court ignores the second positive identification of the Defendant, probable cause existed for the Defendant's arrest.

the police did not witness any actual illegality). The "Fourth Amendment does not require that a police officer *know* a crime has occurred at the time the officer arrests or searches a suspect." *Id.* at 415. "The Fourth Amendment, after all, necessitates an inquiry into probabilities, not certainty." *Id.*

Nor does it matter that the drug transaction between the Informant and the Defendant "never took place." *United States v. Gill*, 685 F.3d 606, 610 (6th Cir. 2012) (holding that a detailed tip from an informant about a planned drug sale, substantially corroborated by police, established probable cause, even though the defendant was arrested as soon as he arrived at the agreed-upon location and exited his car). "The law does not require that an illegal act be completed for sufficient probable cause to develop; it merely requires the existence of 'facts that … could lead a reasonable person to believe that an illegal act has occurred or is about to occur.'" *Id.* (quoting *Strickland*, 144 F.3d at 416).

Here, the events and circumstances leading up to the arrest support a finding of probable cause. Therefore, the R&R correctly concluded that the warrantless arrest of the Defendant was lawful under the Fourth Amendment.

**C. The search of the Defendant's person and the seizure of the key fob was lawful.**

Having found that probable cause supported the Defendant's arrest, it necessarily follows that the officers had authority to conduct a search of the Defendant's person, incident to that lawful arrest. *United States v. Campbell*, 486 F.3d 949, 955 (6th Cir. 2007) (citing *United States v. Robinson*, 414 U.S. 518, 235 (1973)) ("Once a lawful arrest has been made, the police officer is permitted to search the individual."). And, officers "may seize both contraband and any instrumentalities, fruits, or evidence of a crime that they

discover in the course of the search." *United States v. Stewart*, 315 F. App'x 554, 559 (6th Cir. 2009) (internal citations omitted). Accordingly, the officers lawfully searched the Defendant and lawfully discovered the Acura key fob in his pocket. "His statement disclaiming" any possessory interest or association with the Acura SUV "in turn, justified the further step of seizing the keys." *Id.* at 559-60. As the Sixth Circuit has described, an individual's possession of keys, when juxtaposed with statements disclaiming knowledge about those keys or the vehicle "suggest[s] two possibilities":

> One [is] that Defendant was speaking truthfully and that the keys did not belong to him, in which case the officers reasonably sought to identify the vehicle and owner to which they belonged. The other possibility [is] that Defendant was lying and that he owned (or at least knew something about) the vehicle associated with the keys found in his pocket, suggesting that the vehicle might contain fruits, evidence, or instrumentalities of his drug-related offense. In either case, the officers were justified in seizing the keys to look for the vehicle.

*Id.* at 560.

Moreover, the Sixth Circuit has held that "[t]he mere insertion of a key into a lock, by an officer who lawfully possesses the key and is in a location where he has a right to be, to determine whether the key operates the lock, is not a search." *United States v. Salgado*, 250 F.3d 438, 456 (6th Cir. 2001). Therefore, Supervisor Stine's activation of the lock and unlock features on the key fob, which were lawfully in his possession, was not a search of the SUV and did not violate the Fourth Amendment.[4]

    **D.    The search of the SUV was supported by probable cause.**

The Defendant takes issue with the R&R's reliance on the automobile exception to the warrant requirement, and argues that the contraband found inside the SUV must be suppressed. (Doc. # 45 at 5-6). The Defendant's arguments are not well taken.

---

[4]    At that time, the officers did not look inside or search the SUV. (Doc. # 39 at 40:5-8).

"Under the automobile exception to the warrant requirement, an officer may perform a warrantless search of a detained vehicle should the officer have probable cause to believe the vehicle contains contraband or evidence of criminal activity."[5] *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012); *see also United States v. Ross*, 456 U.S. 798 (1982). "[P]robable cause exists when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003). "In looking at all relevant facts, the question becomes whether the police established 'a fair probability that contraband or evidence of a crime" would be found in the SUV. *United States v. Arnold*, 442 F. App'x 207, 210 (6th Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

In this case, the probable-cause standard is easily satisfied. After arresting the Defendant and confirming that the key fob found in his pocket matched the maroon Acura SUV, the officers "had probable cause to believe [that the Defendant's SUV] contained contraband and were, therefore, justified in their warrantless search." *Id.* at 210. "The police could point to a variety of specific facts to establish a fair probably that [the Defendant's SUV] contained contraband: the confidential informant's tips and corroboration thereof … the informant's arrangement of a controlled buy over the phone, and [the Defendant's] drive to the proposed drug deal location." *Id.* at 210-11. Moreover, probable cause was also established when Agent Taylor's K-9 alerted to the presence of

---

[5]    Because the R&R relies on the automobile exception to the warrant requirement to justify the search of the SUV, the Defendant's arguments regarding his physical proximity to the SUV are misplaced. (Doc. # 45 at 5). The Defendant's proximity would be relevant only if the search of the Defendant's SUV was based on the search-incident-to-arrest exception. *Arizona v. Grant*, 556 U.S. 332 (2009).

narcotics inside the SUV.[6]  *United States v. Winters*, 782 F.3d 289, 304 (6th Cir. 2015) (quoting *United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012)) ("An alert by a properly trained and reliable drug-detection dog is sufficient to establish probable cause for the presence of a controlled substance" and "such probable cause extends to 'every part of the vehicle and all containers found therein in which the object of the search could be hidden.'").  Therefore, the officers had probable cause to search the Defendant's SUV and the R&R correctly concluded that the automobile exception applies and that suppression of the evidence found in the SUV is not warranted.

**E.    Shahana Hollon's consent to search the apartment was valid.**

Again, the Fourth Amendment protects the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Stricker*, 710 F.3d at 358 (citing U.S. Const. amend. IV).  The "home is afforded the greatest amount of protection."  *Id.*  Although "a warrant is generally required for a search of a home," there are "certain categories of permissible warrantless searches" that have "long been recognized."  *Fernandez v. California*, 134 S. Ct. 1126, 1132 (2014).  "Consent searches occupy one of these categories."  *Id.*  Therefore, "consent by one resident of jointly occupied premises is generally sufficient to justify a warrantless search."  *Id.* at 1134.  That consent, however, must be "freely and voluntarily given."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).

"Consent is voluntary when it is 'unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion.'"  *United States v. Beauchamp*, 659 F.3d 560,

---

[6]    The "use of a well-trained narcotics-detection dog" on the outside of an automobile is not a "search" within the meaning of the Fourth Amendment.  *Illinois v. Caballes*, 543 U.S. 405, 409 (2005).

571 (6th Cir. 2011) (quoting *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008)). "Voluntariness is determined by examining the totality of the circumstances." *Id.* at 571-72. "Several factors should be examined in the consent calculus." *Id.* at 572. "First, a court should examine the characteristics of the [person giving consent], including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights." *Id.* (citing *United States v. Jones*, 846 F.2d 358, 360 (6th Cir. 1988)). "While the police do not have to inform an individual of his right to refuse, the absence of such a warning is considered in the totality of the circumstances analysis." *Id.* "Second, a court should consider the details of the detention, including the length and nature of detention, the use of coercive or punishing conduct by the police, and indications of more subtle forms of coercion that might flaw an individual's judgment." *Id.* (internal citations omitted).

Ms. Hollon's characteristics do not suggest that she was incapable of providing voluntary consent. As the R&R noted, Ms. Hollon's age, intelligence, education, and understanding of her constitutional rights[7] support a finding of voluntariness. (Doc. # 44 at 32-33). Nor is there evidence of overt duress or coercion. Ms. Hollon was not handcuffed or placed under arrest and the officers did not use coercive or punishing conduct to procure Ms. Hollon's consent.

Instead, the Defendant suggests that there were "more subtle forms of coercion" at play. *Moon*, 513 F.3d at 537. To support that suggestion, the Defendant relies on a single fact: Agent Taylor's statement to Ms. Hollon regarding potential involvement by the Cabinet for Health and Family Services. (Doc. # 39 at 77:14-78:6). That veiled child-

---

[7] The consent-to-search form Ms. Hollon signed indicates that her consent to search was "freely" given and that she had "not been threatened" or "forced in any way." (Doc. # 26- 1).

custody threat, the Defendant claims, makes this case indistinguishable from *United States v. Ivy*, 165 F.3d 397 (6th Cir. 1998).  (Doc. # 45 at 8-9).  Not so.

In *Ivy*, "one and a half hours passed between the officers' initial request for consent and Ivy's ultimate decision to sign the consent form."  *Ivy*, 165 F.3d at 402.  The officers also "used unlawful threats in order to secure Ivy's consent."  *Id.*  Specifically, an offer told Ivy that if he "did not sign a consent form, everyone in the house, including Ivy's girlfriend … would go to jail, and that Ivy and Jones's child would be taken into government protective custody."  *Id.*  The Sixth Circuit determined that the officer's statement, even if true, was not designed "to provide Ivy with data upon which to base his decision to consent, but rather was attempting to overcome Ivy's resolution *not* to consent."  *Id.* at 403.  "Even more disturbing than [the officer's] foreboding statements," were the "actions the police took with regard to [Ivy's girlfriend] and her child while awaiting either consent or a warrant to search Ivy's house."  *Id.*  Specifically, Ivy's girlfriend was handcuffed, by her legs, to the kitchen table, and was separated from her child.  *Id.*  Those "antagonistic actions by the police" against Ivy's family "taint[ed] the voluntariness of any subsequent consent."  *Id.*

Those coercive facts, which led the Sixth Circuit to determine that the consent in *Ivy* was involuntary, are not present here.  The officers took no antagonistic actions against Ms. Hollon or her family, nor was she handcuffed, separated from her children, or subjected to a prolonged length of detention.  Moreover, there are significant differences between the child-custody threat in *Ivy* and the alleged threat in this case.  Specifically, Agent Taylor's comment regarding Cabinet involvement was not mentioned as a potential consequence of Ms. Hollon's refusal to consent, as it was in *Ivy*; rather, Agent Taylor's

comment about Cabinet involvement was premised on the presence of narcotics in the home.  Therefore, *Ivy* is easily distinguishable from the case at bar.

As the R&R correctly found, the Government has satisfied its burden of proving by clear and positive testimony that Ms. Hollon's consent to search her residence was freely and voluntarily given.  Accordingly, the evidence obtained as a result of that search need not be suppressed.

**F.    The search of the cellphones reasonably continued past the warrant's expiration date.**

In his fourth and final objection to the R&R, the Defendant takes issue with the R&R's conclusion that suppression of the evidence obtained from the search of the cellphones was not required.  (Doc. # 45 at 6-8).  Specifically, the Defendant claims that the evidence obtained from the officers' search of the cellphones must be suppressed because the warrant had expired before the data was extracted.  *Id.*

It is undisputed that Agent Taylor's search of the cellphones extended beyond the warrant's expiration date.  The warrants commanded the United States to execute the warrants within fourteen days—on or before June 26, 2017.  (Docs. # 26-2, 26-3, 26-4, and 26-5).  After the Cellbrite program was unable to electronically extract data from three of the four cellphones seized during the investigation, Agent Taylor conducted manual searches of those cellphones and took photographs of the displayed contents, including text messages and other data.  (Doc. # 39 at 85:13-86:1).  The manual search took him a couple of days and he completed the search of the cellphones on June 27, 2017—one day after the warrants expired.  *Id.*

When a search pursuant to a valid warrant begins within the required time period, but extends beyond the expiration of the warrant, courts have applied a "reasonable

continuation" rule.  *See, e.g.*, *United States v. Gerber*, 994 F.2d 1556, 1559 (11th Cir. 1993); *see also United States v. Keszthelyi*, 308 F.3d 557, 568-570 (6th Cir. 2002) (citing *Gerber* with approval but determining that facts in that case did not present a situation where the search was a "reasonable continuation.").[8]  Such a rule comports with the "ultimate touchstone of the Fourth Amendment"—reasonableness.  *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

Despite the Defendant's characterization of Agent Taylor's actions in continuing the search of the cellphones and ignoring the warrant's expiration dates as "reckless," (Doc. # 45 at 6), the "reasonable continuation" rule applies to legitimize the continued search of the cellphones in this case.  Like in *Gerber*, the officers knew before postponing the search of the cellphones that they wanted to examine the contents of the cellphones, and "had probable cause to believe that evidence would be found there." *Keszthelyi*, 308 F.3d at 570.  "In attempting to complete this aspect of their search, however, they encountered an obstacle that impeded their access"—the Cellbrite program was incompatible and therefore, they could not electronically extract the data. *Id.*  Therefore, "the circumstances gave rise to a reasonable decision to postpone the search" and perform a manual search instead*. Id.*

Although it may be true that Agent Taylor's continuation of the search constitutes a violation of Federal Rule of Criminal Procedure 41's fourteen-day execution

---

[8]     The Sixth Circuit recently indicated that *Keszthelyi*'s narrow interpretation of the "reasonable continuation" rule is limited to the home-search context and that the "reasonable continuation" rule permits a "repeated search of an electronic device." *United States v. Castro*, No. 17-1590, 2018 WL 746537 (Feb. 7, 2018) ("A comparison of the two settings—a repeat search of an occupied home and a repeat search of a phone that remains in police custody—gives analogy a bad name.").

requirement,[9] the Sixth Circuit has been reluctant to suppress evidence as a remedy for technical violations of Rule 41. *See e.g.*, *United States v. Twenty-Two Thousand, Two Hundred Eighty Seven Dollars ($22,287.00), U.S. Currency*, 709 F.2d 442 (6th Cir. 1983) (refusing to exclude evidence despite multiple failures to comply with Rule 41, including the lack of a ten-day execution requirement); *see also United States v. Searp*, 586 F.2d 1117, 1121 (6th Cir. 1978) (refusing to apply the exclusionary rule even though the search was conducted at night and the affidavit did not show reasonable cause for nighttime service and the warrant did not authorize such service).

When presented with technical violations of Rule 41[10] and a request to suppress the resulting evidence, the Sixth Circuit has cautioned that "violations of Rule 41 alone should not lead to exclusion unless (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *Searp*, 586 F.2d at 1125. Here, the continuation of the search past the warrant's expiration date resulted in no prejudice to the Defendant. Nor is there any evidence of intentional or deliberate disregard for the Rule's fourteen-day expiration provision. Therefore, "requiring suppression in [this case[ ] would be a remedy out of all

---

[9]  The Court notes that it is far from clear that the facts here violated Rule 41. Rule 41 requires execution of the warrant within fourteen days. Here, the search of the cellphones began before the warrants expired, but merely continued one day past the expiration date.

[10]  The Court hesitates to characterize time limits in a warrant as merely a "technical" and procedural requirement of Rule 41. Although the Fourth Amendment does not specify that search warrants contain expiration dates, the Sixth Circuit has held that a search warrant that contains no termination date is invalid. *See United States v. Bailey*, 628 F.2d 938 (6th Cir. 1980). Here, however, the validity of the warrant is not at issue. The warrants contained reasonable fourteen-day time limits, as required by Rule 41. The only issue, therefore, is whether the execution of those warrants was completed within that time limit or reasonably continued past the expiration date.

proportion to the benefits gained to the end of obtaining justice while preserving individual liberties unimpaired." *Id.* at 1123.

Even assuming the continuation of the search was not "reasonable" and violated the Fourth Amendment, exclusion of the evidence is not warranted. "The fact that a Fourth Amendment violation occurred … does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). "Indeed, exclusion 'has always been our last resort, not our first impulse.'" *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). Thus, there are "important principles that constrain application of the exclusionary rule." *Id.* "First, the exclusionary rule is not an individual right and applies only where it results in appreciable deterrence." *Id.* at 141 (internal citations and alterations omitted). "In addition, the benefits of deterrence must outweigh the costs." *Id.* "'[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against the substantial social costs exacted by the exclusionary rule.'" *Id.* (quoting *Illinois v. Krull*, 480 U.S. 340, 352 (1987)). "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that offends basic concepts of the criminal justice system." *Id.* (internal citations and quotation marks omitted). To "trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the judicial system." *Id.* at 144. Therefore, the Court must determine whether the deterrent benefits outweigh the social costs of excluding the evidence obtained from the continued search of the cellphones.

Here, that task is simple. The alleged police misconduct that led to the discovery of the incriminating evidence—the continuation of a search a mere one day past the fourteen-day expiration deadline—is not "sufficiently deliberate that the exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *United States v. Master*, 614 F.3d 236, 243 (6th Cir. 2010). Instead, this is an instance where the police acted with an "objectively reasonable good-faith belief that their conduct [was] lawful" or where their "conduct involves only simple, isolated negligence." *Davis v. United States*, 564 U.S. 229 (2011). Therefore, suppression of the evidence is not warranted and the Defendant's Motions to Suppress (Docs. # 21) is denied.

## III. CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)     The Report and Recommendation of the United States Magistrate Judge (Doc. # 44) is hereby **adopted** as the findings of fact and conclusions of law of the Court;

(2)     Defendant's Objections (Doc. # 45) are hereby **overruled** as set forth herein;

(3)     Defendant's Motion to Suppress (Doc. # 21) is hereby **denied in full**;

(4)     The time period between the filing of the Motion to Suppress and this Order, with the exception of 5 days, which totals 206 days, is **excluded** from the provisions of the Speedy Trial Act pursuant to 18 U.S.C. 3161(h)(1)(D); and

(5)     This matter is scheduled for a **Status Conference** on **Monday, February 26, 2018 at 10:00 a.m. in Covington**.

This 22nd day of February, 2018.



Signed By:
*David L. Bunning*
United States District Judge

K:\DATA\ORDERS\Covington Criminal\2017\17-15 MOO adopting R&R re DE 21.docx